UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR - 8 2017

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   MAR - 6 2017

CLERK

MAR - 8 2017   **UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

**Cellco Partnership d/b/a Verizon Wireless,**

**Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD,**

17-1069

**Respondent.**

ORIGINAL

## PETITION FOR REVIEW OF A DECISION AND ORDER
## OF THE NATIONAL LABOR RELATIONS BOARD

Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless") hereby

petitions this Court for review of those portions of the Decision and Order of the

Respondent National Labor Relations Board in Case 28-CA-145221, reported at

365 NLRB No. 38, entered on February 24, 2017, which held that Verizon

Wireless violated Section 8(a)(1) of the National Labor Relations Act by

maintaining Code of Conduct provisions Section 1.6, Solicitation and Fundraising;

the 2014 version of Section 1.8, Employee Privacy; Section 2.1.3, Activities

Outside of Verizon Wireless; Section 3.4.1, Prohibited Activities; and two bullet

points in Code of Conduct's conclusion. Verizon Wireless requests that such

portions of the Decision and Order be modified or set aside. A copy of the

Decision and Order is attached, along with a Corporate Disclosure Statement.

Dated:  March 6, 2017

Respectfully submitted,

E. Michael Rossman /jrj

E. Michael Rossman
JONES DAY
77 West Wacker Drive
Chicago, IL  60601-1692
T:  (312) 269-4305
F:  (312) 782-8585
emrossman@jonesday.com

*Counsel for Petitioner Cellco*
*Partnership d/b/a Verizon Wireless\**

*\* Admitted in Ohio;*
*not yet admitted in Illinois*

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2017, I caused the foregoing Petition for Review of Decision and Order of the National Labor Relations Board and supporting materials to be served via overnight delivery on the following:

Linda Dreeben
Appellate and Supreme Court Litigation
National Labor Relations Board
1015 Half Street SE
Washington, D.C.  20570-0001

Cornele A. Overstreet
Regional Director
NLRB Region 28
2600 North Central Avenue, Suite 1400
Phoenix, AZ  85004

Alexander J. Gancayco, Esq.
NLRB Region 28
2600 North Central Avenue, Suite 1400
Phoenix, AZ  85004

David A. Rosenfeld, Esq.
WEINBERG, ROGER & ROSENFELD
1001 Marina Village Parkway, Suite 200
Alameda, CA  94501

Ms. Sara Parrish
P.O. Box 8019
Chandler, AZ  85246-8019

E. Michael Rossman /jrj
*Attorney for Petitioner*

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CELLCO PARTNERSHIP D/B/A VERIZON
WIRELESS,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court, Cellco Partnership d/b/a Verizon Wireless ("Verizon Wireless") hereby submits the following corporate disclosure statement:

Verizon Wireless provides wireless telecommunications products and services throughout the United States. Verizon Wireless is a general partnership and is indirectly, wholly owned by Verizon Communications Inc., which is a publicly traded corporation.

Dated:  March 6, 2017

Respectfully submitted,

E. Michael Rossman
JONES DAY
77 West Wacker Drive
Chicago, IL  60601-1692
T:  (312) 269-4305
F:  (312) 782-8585
emrossman@jonesday.com

*Admitted in Ohio;*
*not yet admitted in Illinois*

*Counsel for Petitioner Cellco*
*Partnership d/b/a Verizon Wireless*

*NOTICE: This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Cellco Partnership d/b/a Verizon Wireless *and* Sara Parrish.** Cases 28–CA–145221

February 24, 2017

DECISION AND ORDER

BY ACTING CHAIRMAN MISCIMARRA AND MEMBERS PEARCE AND MCFERRAN

On September 18, 2015, Administrative Law Judge Mary Miller Cracraft issued the attached decision. The General Counsel and the Respondent both filed exceptions, supporting briefs, and answering briefs. The Charging Party filed cross-exceptions, a supporting brief, and a reply brief.

The National Labor Relations Board has considered the decision and the record in light of the exceptions, cross-exceptions, and briefs and has decided to affirm the judge's rulings, findings, and conclusions in part,[1] to reverse them in part, and to adopt the judge's recommended Order as modified and set forth in full below.[2]

The General Counsel alleges that several rules in the Respondent's Code of Conduct are facially unlawful because employees would reasonably construe them to prohibit protected activity. The Code of Conduct, originally promulgated some time before August 2014, was revised in April 2015. The parties stipulated that most of the Respondent's facilities now use the 2015 Code of

---

[1] We have amended the judge's conclusions of law consistent with our findings herein.

[2] We shall modify the judge's recommended Order to conform to our findings and to the Board's standard remedial language. We shall substitute a new notice that conforms to the Order as modified.

The Respondent contends that a nationwide posting of a notice to employees, as well as mailing notices to employees of closed facilities who were employed at those facilities at any time since August 2014, are burdensome and inappropriate remedies. We disagree. Nationwide postings are appropriate remedies for unlawful companywide policies, see *Guardsmark, LLC*, 344 NLRB 809, 812 (2005) ("Concerning the scope of notice posting, we have consistently held that, where an employer's overbroad rule is maintained as a companywide policy, we will generally order the employer to post an appropriate notice at all of its facilities where the unlawful policy has been or is in effect."), enfd. in relevant part 475 F.3d 369 (D.C. Cir. 2007), and mailings to former employees of closed facilities is a standard Board remedy.

On December 23, 2016, the Respondent filed a motion to stay these proceedings. The Charging Party and the General Counsel filed oppositions, and the Respondent filed reply briefs. In its motion, the Respondent notes that there are two other pending cases regarding the lawfulness of the same Code of Conduct provisions, including one currently before an administrative law judge, and that the Board should decide all of the cases in one decision. We disagree and deny the Respondent's motion. We believe that the issuance of the decision in this case will expedite the resolution of the two other cases.

Conduct, but some still use the 2014 Code of Conduct. Except for Section 1.8 Employee Privacy, all of the rules at issue here are identical in both the 2014 and 2015 versions. Thus, except for Section 1.8, our findings apply to both the 2014 version and the 2015 version.

The judge found, and we agree, that the Respondent violated Section 8(a)(1) by maintaining Section 1.6 Solicitation and Fundraising, Section 3.4.1 Prohibited Activities, and two bullet points in the Conclusion. For the reasons stated by the judge, we also agree that the 2014 version of Section 1.8 Employee Privacy violates Section 8(a)(1) of the Act.[3]

The 2014 version of Section 1.8 states,

> Verizon Wireless acquires and retains personal information about its employees in the normal course of operations, such as for employee identification purposes and provision of employee benefits. You must take appropriate steps to protect all personal employee information, including social security numbers, identification numbers, passwords, financial information and residential telephone numbers and addresses.

---

[3] In evaluating the lawfulness of the Respondent's Code of Conduct rules, we agree with the judge's application of *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004). We note our dissenting colleague's view that the standard set forth in *Lutheran Heritage* should be changed. We reject that view for the reasons stated in *William Beaumont Hospital*, 363 NLRB No. 162, slip op. at 2–6 (2016).

In evaluating the lawfulness of the Respondent's Code of Conduct rules restricting employees' access to the Respondent's email system, the judge properly applied the standard set forth in *Purple Communications, Inc.*, 361 NLRB No. 126, slip op. at 14 (2014). Our dissenting colleague takes issue with that standard, as well. We reject his position for the reasons stated in *Purple Communications*. Id., slip op. at 6 fn. 18, 14–15 fn. 71.

We also agree with the judge that Section 3.4.1 unlawfully chills employees' protected conduct in violation of Sec. 8(a)(1) of the Act. The General Counsel excepts to the judge's failure to find that Section 3.4.1 also unlawfully prohibits employees from using the Respondent's email, instant messaging, Intranet, or Internet systems to transmit "offensive" or "harassing" content and "chain letters," "unauthorized mass distributions," and "communications primarily directed to a group of employees inside the company on behalf of an outside organization." We find merit in the General Counsel's exception pertaining to the rule's prohibitions on "unauthorized mass distributions" and "[c]ommunications primarily directed to a group of employees inside the company on behalf of an outside organization." Employees would reasonably read those illustrations in the rule as restricting them from using the Respondent's systems to engage in protected activity. Moreover, the Respondent has not shown that those restrictions are necessary to prevent interference with the efficient functioning of its systems. See *Purple Communications*, above, slip op. at 15 (2014). However, we find that the rule lawfully bars employees from transmitting "offensive" or "harassing" content and "chain letters" because employees would not reasonably read those terms, as they are used in the rule, to encompass protected communications.

> You should never access, obtain or disclose another employee's personal information to persons inside or outside of Verizon Wireless unless you are acting for legitimate business purposes and in accordance with applicable laws, legal process and company policies, including obtaining any approvals necessary under these policies.

While recognizing that employers have a substantial and legitimate interest in maintaining the privacy of certain business information, the judge correctly found that the employees would reasonably read the Respondent's broadly worded rule to prohibit them from discussing their terms and conditions of employment or disclosing personal employee information. Our dissenting colleague asserts that this rule is lawful because it pertains only to the disclosure of employee information acquired and retained by the Respondent—not to personal employee information obtained in any other way. We reject that argument. First, in certain circumstances, employees have a Section 7 right to obtain the names and telephone numbers of employees from their employer's records. See *Rocky Mountain Eye Center, P.C.*, 363 NLRB No. 34, slip op. at 1 fn. 1, 9–11 (2015).[4] Second, although the first paragraph of the rule notes that the Respondent "acquires and retains personal information about its employees" and that employees "must take appropriate steps to protect all personal employee information," the second paragraph does not reference the preceding paragraph or use any other language that would indicate that the first paragraph limits the broad reach of the second. The second paragraph also does not include any qualifications of the term, "employee's personal information." Lastly, although our dissenting colleague notes some of the employee privacy safeguards in the Board's final rule on representation-case procedures, 79 Fed. Reg. 74308 (Dec. 15, 2014), we find them inapposite to the Respondent's rule. The representation-case procedures ensure that a nonemployer party to a representation proceeding does not abuse the voter list that, under longstanding Board law, it is given to allow it to communicate with employees regarding the election, investigate eligibility issues, and facilitate the parties' entry into election agreements. In contrast, the Respondent's rule is not directed at preventing the abuse of employee information by any nonemployer party. Instead, it imposes a prohibition on the employees themselves sharing other employees' personal contact information, and therefore directly interferes with the right to communicate and engage in or-

ganizational activity that lies at the heart of Section 7. Accordingly, like the judge, we find that employees would reasonably read this rule to prohibit their Section 7 right to disclose certain personal information about other employees, including their residential telephone numbers and addresses.

We also agree with the judge that, when read in context, the 2015 version of Section 1.8 is lawful, as is Section 3.3 Proper Use of Verizon Wireless' Property and Property Owned by Others.[5] However, we reverse the judge and find that Section 2.1.3 Activities Outside of Verizon Wireless is also unlawfully overbroad.

The relevant language in Section 2.1.3 provides:

> Many employees participate in an individual capacity in outside organizations (such as their local school board or homeowners' association). Memberships in these associations can cause conflicts if they require decisions regarding Verizon Wireless or its products. If you are a member of an outside organization, you must remove yourself from discussing or voting on any matter that involves the interests of Verizon Wireless or its competitors. You must also disclose this conflict to your outside organization without disclosing non-public company information and you must disclose any such potential conflict to the VZ Compliance Guideline. Participation in any outside organization should not interfere with your work for Verizon Wireless. To the extent that your participation infringes on company time or involves the use of Verizon Wireless resources, your supervisor's approval is required.

The judge found that the language of the rule addresses only the ethics of an employee's business decision involving the Respondent or its products made while participating in an outside organization. We disagree for the following reasons. First, the rule broadly pertains to *any* matter that involves the interests of the Respondent or its competitors. Although the rule mentions a local school board or homeowners' association as examples of "outside organizations," it does not provide any qualifications as to the type of organizations covered. Thus, employees would reasonably construe the rule as also restricting

---

[4] Our dissenting colleague asserts that *Rocky Mountain* is the "exception that proves the rule" that employees' removal of information from confidential employer files outside their normal course of work activity is not protected by the Act. Without passing on our colleague's assertion that such a rule exists, we disagree with his claim that Section 1.8 is limited to such conduct.

[5] Unlike the 2014 Code of Conduct, the scope of Section 1.8 Employee Privacy in the 2015 Code of Conduct is narrow. The 2015 version specifically lists the type of confidential information covered to include social security numbers, identification numbers, passwords, bank account information, and medical information. Significantly, in contrast to the 2014 version, the 2015 rule does not address personal employee contact information, such as residential telephone numbers and addresses, or any personnel or other documents pertaining to employees' terms and conditions of employment. Hence, we agree with the judge that, when the 2015 rule is read in context, employees would not reasonably read it to interfere with their Sec. 7 rights.

their participation in labor unions, in clear contravention of their rights under Section 7 of the Act. Second, employees would reasonably fear that the broad language in the rule prohibits them from engaging in any conduct the Respondent may consider detrimental to its image or reputation or as presenting a "conflict" with its interests, such as engaging in picketing, strikes, or other economic pressure. See *Sheraton Anchorage*, 362 NLRB No. 123, slip op. at 1 fn. 4 (2015) (employees would reasonably read rule against having a "conflict of interest" with the employer to encompass protected activities); *First Transit*, 360 NLRB No. 72, slip op. at 2 fn. 5 (2014) (unlawful rule prohibiting participation in outside activities where a conflict of interest exists). Third, the rule is unlawfully overbroad in barring employees, when reporting a "conflict" to an outside organization, from disclosing "nonpublic company information," which in the absence of any limiting language clearly implicates terms and conditions of employment. See *Rio All-Suites Hotel & Casino*, 362 NLRB No. 190, slip op. at 1 (2015) (prohibition on employees sharing any information about the employer not shared with the general public clearly implicates terms and conditions of employment). Finally, the rule's requirement that employees notify the Respondent about any such potential "conflict" is unlawful because employees would reasonably read it as requiring them, in certain circumstances, to inform the Respondent of their union and other protected activity. See *Casino San Pablo*, 361 NLRB No. 148, slip op. at 4 fn. 6 (2014) (unlawful to require employees to disclose their intent to engage in protected activity). Accordingly, we find that Section 2.1.3 Activities Outside of Verizon Wireless violates Section 8(a)(1).

### Amended Conclusions of Law

1. Substitute the following as Conclusion of Law 4.

"4. The Respondent violated Section 8(a)(1) of the Act by maintaining Section 2.1.3 Activities Outside of Verizon Wireless in its 2014 and 2015 Codes of Conduct, in effect since August 2014 and April 29, 2015, respectively."

2. Substitute the following as Conclusion of Law 6.

"6. The Respondent violated Section 8(a)(1) of the Act by maintaining the following language in Section 3.4.1 Prohibited Activities in its 2014 and 2015 Codes of Conduct, in effect since August 2014 and April 29, 2015, respectively: prohibitions against using company systems (such as e-mail, instant messaging, the Intranet or Internet) to engage in activities that result in the Respondent's 'embarrassment' and for 'unauthorized mass distributions' and 'communications primarily directed to a group of employees inside the company on behalf of an outside organization.'"

### ORDER

The National Labor Relations Board orders that the Respondent, Cellco Partnership d/b/a Verizon Wireless, Basking Ridge, New Jersey, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining Section 1.6 Solicitation and Fundraising in the 2014 and 2015 Codes of Conduct prohibiting employees from "the use of company resources at any time (emails, fax machines, computers, telephones, etc.) to solicit or distribute."

(b) Maintaining Section 1.8 Employee Privacy in the 2014 Code of Conduct requiring employees to "take appropriate steps to protect all personal employee information, including . . . residential telephone numbers and addresses," and prohibiting employees from "access[ing], obtain[ing] or disclos[ing] another employee's personal information to persons inside or outside of Verizon Wireless unless you are acting for legitimate business purposes and in accordance with applicable laws, legal process and company policies, including obtaining any approvals necessary under these policies."

(c) Maintaining Section 2.1.3 Activities Outside of Verizon Wireless in the 2014 and 2015 Codes of Conduct stating that memberships in outside organizations or associations "can cause conflicts if they require decisions regarding Verizon Wireless or its products" and requiring employees who are members of an outside organization to "remove yourself from discussing or voting on any matter that involves the interests of Verizon Wireless or its competitors," "disclose this conflict to your outside organization without disclosing non-public company information," and "disclose any such potential conflict to the VZ Compliance Guideline."

(d) Maintaining Section 3.4.1 Prohibited Activities in the 2014 and 2015 Codes of Conduct prohibiting employees from "us[ing] company systems (such as e-mail, instant messaging, the Intranet or Internet) to engage in activities that . . . result in Verizon Wireless' . . . embarrassment," or a rule listing the following as some examples of inappropriate uses of the company systems:

> "[U]nauthorized mass distributions"; and
>
> "Communications primarily directed to a group of employees inside the company on behalf of an outside organization."

(e) Maintaining the Conclusion in the 2014 and 2015 Codes of Conduct that states that the following are examples of actions considered illegal or unacceptable:

> "Theft or unauthorized access, use or disclosure of company, customer or employee records, data, funds,

4                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

property or information (whether or not it is proprietary)"; and

"Disparaging or misrepresenting the company's products or services or its employees."

(f) In any like or related manner interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind Section 1.6 Solicitation and Fundraising in the 2014 and 2015 Codes of Conduct, Section 1.8 Employee Privacy in the 2014 Code of Conduct, Section 2.1.3 Activities Outside of Verizon Wireless in the 2014 and 2015 Codes of Conduct, Section 3.4.1 Prohibited Activities in the 2014 and 2015 Codes of Conduct, and the two unlawful bullet points in the Conclusion in the 2014 and 2015 Codes of Conduct at all of the Respondent's offices and places of business throughout the United States where they are in effect.

(b) Furnish all employees with inserts for the 2014 and 2015 Codes of Conduct presently in effect at their respective offices and places of business that (1) advise that the above rules have been rescinded, or (2) provide the language of lawful rules; or publish and distribute revised 2014 and 2015 Codes of Conduct that (1) do not include the above rules, or (2) provide the language of lawful rules.

(c) Within 14 days after service by the Region, post at all of its facilities nationwide where the unlawful policies have been in effect or are currently in effect copies of the attached notice marked "Appendix."[6]  Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by the Respondent and maintained for 60 consecutive days in conspicuous places, including all places where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if the Respondent customarily communicates with its employees by such means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed any of the facilities involved in this proceeding, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all

current employees and former employees employed by the Respondent at those facilities at any time since August 2014.

(d) Within 21 days after service by the Region, file with the Regional Director for Region 28 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that the Respondent has taken to comply.

Dated, Washington, D.C.  February 24, 2017

_____
Mark Gaston Pearce,                    Member

_____
Lauren McFerran,                       Member

(SEAL)          NATIONAL LABOR RELATIONS BOARD

MEMBER MISCIMARRA, concurring in part and dissenting in part.

At issue in this case is whether the Respondent violated Section 8(a)(1) of the National Labor Relations Act (NLRA or Act) by maintaining various provisions in the 2014 and 2015 versions of its Code of Conduct.  To make that determination for many of the provisions at issue here, the judge and my colleagues apply prong one of the standard set forth in *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004), under which the Board asks whether employees "would reasonably construe the language" of an employer's rule, policy or handbook provision "to prohibit Section 7 activity." Id. at 647.  For other Code of Conduct provisions at issue here, the judge and my colleagues apply *Purple Communications, Inc.*, 361 NLRB No. 126 (2014), in which a Board majority, overruling in relevant part *Register Guard*, 351 NLRB 1110 (2007), held that if employees have been granted access to their employer's email system for work-related purposes, they are rebuttably presumed to have a right to use that system to engage in NLRA-protected communications on nonworking time.

I disagree with the *Lutheran Heritage* "reasonably construe" standard.  For the reasons I explained in my separate opinion in *William Beaumont Hospital*, 363 NLRB No. 162, slip op. at 7–24 (2016), which are summarized below, I believe the "reasonably construe" standard should be overruled by the Board or repudiated by the courts.  In its place, I would adopt a standard under which the Board evaluates an employer's workplace rule, policy, or handbook provision by striking a "proper balance" that takes into account both (i) the legitimate

_____
[6] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals Enforcing an Order of the National Labor Relations Board."

justifications associated with the disputed rule and (ii) any adverse impact the rule may have on NLRA-protected activity,[1] and a "facially neutral" policy, rule, or handbook provision—defined as a rule that does not expressly restrict NLRA-protected activity, was not adopted in response to NLRA-protected activity, and has not been applied to restrict NLRA-protected activity—should be declared unlawful only if the legitimate justifications an employer may have for maintaining the rule are outweighed by its potential adverse impact on Section 7 activity.

I also disagree with the Board majority's holding in *Purple Communications*, a decision from which I dissented for the reasons summarized below. See 361 NLRB No. 126, slip op. at 18–28 (Member Miscimarra, dissenting). I believe the Board should overrule *Purple Communications* and reinstate the holding of *Register Guard*, supra, which recognized the right of employers to control the uses of their own property, including their email systems, provided they do not discriminate against NLRA-protected communications by distinguishing between permitted and prohibited uses along Section 7 lines. Thus, I agree with the Board in *Register Guard* that an employer "may lawfully bar employees' non-work-related use of its e-mail system, unless the [employer] acts in a manner that discriminates against Section 7 activity." 351 NLRB at 1116.

Applying my view of applicable legal requirements, I concur with my colleagues' findings as to a few of the Code of Conduct provisions at issue in this case, and I respectfully dissent as to others, as explained below.[2]

### A. The Board's Lutheran Heritage "Reasonably Construe" Test Should Be Overruled by the Board or Repudiated by the Courts

Although NLRA Section 8(a)(1) makes it unlawful for an employer to "interfere with, restrain, or coerce em-ployees in the *exercise* of the rights guaranteed in section 7," the disputed rules in the instant case do not expressly restrict Section 7 activity, were not adopted in response to NLRA-protected activity, and have not been applied to restrict NLRA-protected activity. Nonetheless, as stated above, the judge and my colleagues find the maintenance of most of these rules unlawful. They do so applying *Lutheran Heritage*, under which a facially neutral employment policy, work rule, or handbook provision violates Section 8(a)(1) if employees would "reasonably construe the language" of the rule "to prohibit Section 7 activity."[3] For reasons described at length in my partial dissenting opinion in *William Beaumont*,[4] I believe that the *Lutheran Heritage* "reasonably construe" test should be overruled by the Board or repudiated by the courts. The "reasonably construe" standard defies common sense and is contrary to the Act in numerous respects. It entails a single-minded consideration of NLRA-protected rights—even though the risk of intruding on those rights might be "comparatively slight"[5]—without taking into account the many legitimate justifications associated with particular policies, rules, and handbook provisions, which may have as their purpose avoiding potentially fatal accidents, reducing the risk of workplace violence, or preventing unlawful harassment. As I explained in *William Beaumont*:

- *Lutheran Heritage* is contrary to Supreme Court precedent establishing that, whenever work requirements are alleged to violate the NLRA, the Board *must* give substantial consideration to the justifications associated with the rule, rather than only considering a rule's potential adverse effect on NLRA rights.[6]

---

[1] See *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33–34 (1967) (referring to the Board's "duty to strike the proper balance between . . . asserted business justifications and the invasion of employee rights in light of the Act and its policy"). In performing the balancing discussed in the text, I believe other considerations may be relevant to the Board's determination. These may include, depending on the case, reasonable distinctions between types of rules and justifications, evidence regarding the particular industry or work setting, specific events that may bear on the lawfulness of the disputed rule, and the possibility that the rule may be lawfully maintained even though application of the rule against NLRA-protected conduct may be unlawful. See *William Beaumont*, supra, slip op. at 15, 18–20 (Member Miscimarra, concurring in part and dissenting in part).

[2] I join my colleagues in denying the Respondent's motion to stay these proceedings. I also agree with my colleagues that posting the notice to employees nationwide and mailing the notice to former employees of closed facilities are standard remedies under these circumstances.

[3] *Lutheran Heritage*, 343 NLRB at 647. This standard is sometimes called *Lutheran Heritage* "prong one" because, in *Lutheran Heritage*, the "reasonably construe" test is enumerated as the first item, or "prong," in a three-prong standard for determining whether a challenged policy, work rule, or handbook provision that does not explicitly restrict Sec. 7 activity is nonetheless unlawful. See *William Beaumont*, supra, slip op. at 7 fn. 3 (Member Miscimarra, concurring in part and dissenting in part).

[4] *William Beaumont*, supra, slip op. at 8–18 (Member Miscimarra, concurring in part and dissenting in part).

[5] *Great Dane*, 388 U.S. at 34.

[6] See *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 797–798 (1945) (describing the need to balance the "undisputed right of self-organization assured to employees" with "the equally undisputed right of employers to maintain discipline in their establishments," rights that "are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee," because the "[o]pportunity to organize and proper discipline are both essential elements in a balanced society"); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 229 (1963) (referring to the "delicate task" of "weighing the interests of employees in concerted activity against the interest of the employer in operating his business in a particular manner and of balancing . . . the intended consequences

6    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

- *Lutheran Heritage* is contradicted by the NLRB's own cases establishing that numerous work requirements and restrictions are lawful—for example, no-solicitation and no-distribution rules, off-duty employee access rules, "just cause" provisions, and attendance requirements—notwithstanding the fact that each would fail the *Lutheran Heritage* "reasonably construe" test.[7]

- The Board has engaged in a balancing of competing interests—in the above cases and others spanning more than six decades—*without* disregarding the justifications associated with particular rules and requirements.[8]

- Under *Lutheran Heritage*, the Board has invalidated many facially neutral work rules merely because they are ambiguous. However, the Board's requirement of linguistic precision when applying *Lutheran Heritage* is contrary to the permissive treatment that Congress, the Board, and the courts have afforded to "just cause" provisions, benefit plans, and other employment-related requirements throughout the Act's history.[9] Moreover, given that many ambiguities are inherent in the NLRA itself, it is unreasonable to find that reasonable work requirements violate the NLRA merely because employers cannot discharge the impossible task of anticipating and carving out every possible overlap with some potential NLRA-protected activity.

- The *Lutheran Heritage* "reasonably construe" test stems from several false premises, the most important of which is a misguided belief that unless employers formulate written policies, rules, and handbooks that can never be construed in a manner that conflicts with some type of hypothetical NLRA protection, employees are best served by not having employment policies, rules, and handbooks at all. In this respect, *Lutheran Heritage* requires perfection that literally has become the enemy of the good.[10]

- The *Lutheran Heritage* "reasonably construe" test improperly limits the Board's discretion, contrary to the Board's responsibility to apply the "general provisions of the Act to the complexities of industrial life."[11] It does not permit the Board to afford greater protection to Section 7 activities that are central to the Act (as compared to other types of activity that may lie at the periphery of the Act or rarely if ever occur), to make reasonable distinctions between and among different types of justifications for particular rules, to differentiate between different industries or work settings, or to take into account discrete events that, if considered, may demonstrate that the justifications for certain work requirements outweigh their potential impact on some potential NLRA-protected activity.[12]

- If a particular work rule exists for important reasons that require the Board to conclude that "the rule on its face is *not* unlawful,"[13] *Lutheran Heritage* fails to recognize that the Board subsequently may find that the employer has violated Section 8(a)(1) by *applying* the rule to restrict NLRA-protected activity.[14] Here as well, *Lutheran Heritage* prevents the Board from discharging its duty to apply the

---

upon employee rights against the business ends to be served by the employer's conduct"); *Great Dane*, 388 U.S. at 33–34 (referring to the Board's "duty to strike the proper balance between . . . asserted business justifications and the invasion of employee rights in light of the Act and its policy"); *Southern Steamship Co. v. NLRB*, 316 U.S. 31, 47 (1942) ("[T]he Board has not been commissioned to effectuate the policies of the [Act] so single-mindedly that it may wholly ignore other and equally important Congressional objectives."). Cf. *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 680–681 (1981) ("[T]he Act is not intended to serve either party's individual interest, but to foster in a neutral manner a system in which the conflict between these interests may be resolved."). See generally *William Beaumont*, supra, slip op. at 11–12 (Member Miscimarra, concurring in part and dissenting in part).

[7] See *William Beaumont*, supra, slip op. at 12 (Member Miscimarra, concurring in part and dissenting in part).

[8] Id., slip op. at 12–13, 20–21 (Member Miscimarra, concurring in part and dissenting in part).

[9] Id., slip op. at 8, 13–14 & fns. 29–31 (Member Miscimarra, concurring in part and dissenting in part).

[10] Id., slip op. at 8, 13–15 (Member Miscimarra, concurring in part and dissenting in part).

[11] *NLRB v. Erie Resistor Corp.*, 373 U.S. at 236; see also *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266–267 (1975) ("The responsibility to adapt the Act to changing patterns of industrial life is entrusted to the Board.").

[12] See *William Beaumont*, supra, slip op. at 9, 15 (Member Miscimarra, concurring in part and dissenting in part).

[13] *Aroostook County Regional Ophthalmology Center v. NLRB*, 81 F.3d 209, 213 (D.C. Cir. 1996) (emphasis added).

[14] In *Aroostook County Regional Ophthalmology Center*, supra, the Court of Appeals for the D.C. Circuit stated:

> In the absence of any evidence that [the employer] is imposing an unreasonably broad interpretation of the rule upon employees, the Board's determination to the contrary is unjustified. If an occasion arises where [the employer] is attempting to use the rule as the basis for imposing questionable restrictions upon employees' communications, the employees may seek review of the Company's actions at that time. However, the rule on its face is not unlawful.

Id.; see also *Adtranz ABB Daimler-Benz Transportation v. NLRB*, 253 F.3d 19, 28 (D.C. Cir. 2001) (stating that the Board cannot find a facially neutral rule unlawful based upon "fanciful" speculation, and the Board must "consider the context in which the rule was applied and its actual impact on employees"). See *William Beaumont*, supra, slip op. at 19–20 & fn. 60 (Member Miscimarra, concurring in part and dissenting in part).

"general provisions of the Act to the complexities of industrial life."[15]

- The *Lutheran Heritage* "reasonably construe" test has been exceptionally difficult to apply, many Board decisions have disregarded important qualifications set forth in *Lutheran Heritage* itself,[16] and *Lutheran Heritage* has produced arbitrary results.[17]

As I stated in *William Beaumont*, the Board's experience with the *Lutheran Heritage* "reasonably construe" standard "has revealed its substantial limitations, as well as its departure from the type of balancing required by Supreme Court precedent and the Board's own decisions."[18] For the above reasons, *Lutheran Heritage* should be overruled by the Board, and if the Board fails to do so, it should be repudiated by the courts.

### B. The Purple Communications Standard Is Incorrect and Unworkable

As stated above, the judge and my colleagues also apply *Purple Communications*, supra, which held that when an employer has granted employees access to its email system for work-related purposes, the Board will presume that employees have a right to use that email system during nonworking time to engage in communications protected by the Act, unless the employer demonstrates that special circumstances warrant restricting that

presumptive right.[19] As I explained in my dissenting opinion, I believe the *Purple Communications* standard is incorrect and unworkable.

- The *Purple Communications* standard improperly presumes that when an employer reserves the use of its email system for business purposes, this unreasonably impedes employees' NLRA-protected activities.[20] Far from balancing the "undisputed right of self-organization assured to employees" with "the equally undisputed right of employers to maintain discipline in their establishments,"[21] the Board in *Purple Communications* assumed that restricting an employer's email system to business-related uses constitutes "an unreasonable impediment to self-organization,"[22] notwithstanding the widespread availability of multiple digital platforms (e.g., social media, text messaging, and personal email accounts)—not to mention old-fashioned face-to-face conversation—through which employees may engage in NLRA-protected communications separate and apart from their employer's email system.

- The *Purple Communications* standard fails to accommodate employers' property rights in their information technology resources, which typically cost a great deal to acquire, maintain, and secure.[23]

- The *Purple Communications* standard makes it enormously difficult for employers to enforce a valid rule prohibiting solicitation during working time, where, by the very nature of emails, it is likely that an email sent during one employee's nonworking time will be received and read by employees during their working time. The *Purple Communications* standard also makes it extremely difficult for employers to avoid unlawful surveillance of NLRA-protected activities, even though employers often have legitimate reasons to search and retrieve employee work emails.[24]

- The *Purple Communications* standard, which gives employees a *presumptive* right to use their employer's email system for NLRA-protected communications and places the burden on the employer to demonstrate "special circumstances" warranting restricting that right, fails to give employers and em-

---

[15] *NLRB v. Erie Resistor Corp.*, 373 U.S. at 236; *NLRB v. J. Weingarten, Inc.*, 420 U.S. at 266–267. See generally *William Beaumont*, supra, slip op. at 12 (Member Miscimarra, concurring in part and dissenting in part).

[16] See *William Beaumont*, supra, slip op. at 13–14 fn. 29; id., slip op. at 18 fn. 55 (Member Miscimarra, concurring in part and dissenting in part).

[17] Compare *Adtranz ABB Daimler-Benz Transportation v. NLRB*, 253 F.3d at 27 (finding it *lawful* to maintain rule prohibiting "abusive or threatening language to anyone on company premises") and *Lutheran Heritage*, 343 NLRB at 646–647 (finding it *lawful* to maintain rule prohibiting "abusive or profane language") with *Flamingo Hilton-Laughlin*, 330 NLRB 287 (1999) (finding it *unlawful* to maintain rule prohibiting "loud, abusive or foul language"). Also, compare *Palms Hotel & Casino*, 344 NLRB 1363, 1363 (2005) (finding it *lawful* to maintain rule prohibiting "conduct which is . . . injurious, offensive, threatening, intimidating, coercing, or interfering with" other employees) with *Lafayette Park Hotel*, 326 NLRB 824, 825 (1998) (finding it *unlawful* to maintain rule prohibiting "false, vicious, profane or malicious statements"), enfd. 203 F.3d 52 (D.C. Cir. 1999). See generally *William Beaumont*, supra, slip op. at 15–18 (Member Miscimarra, concurring in part and dissenting in part).

In part, the arbitrary results associated with application of the *Lutheran Heritage* "reasonably construe" standard have resulted from many Board decisions that have disregarded important qualifications set forth in *Lutheran Heritage* itself. See *William Beaumont*, supra, slip op. at 18 fn. 55 (Member Miscimarra, concurring in part and dissenting in part).

[18] *William Beaumont*, supra, slip op. at 18 (Member Miscimarra, concurring in part and dissenting in part).

[19] *Purple Communications, Inc.*, 361 NLRB No. 126, slip op. at 11–16.

[20] Id., slip op. at 20–22 (Member Miscimarra, dissenting).

[21] *Republic Aviation Corp. v. NLRB*, 324 U.S. at 797–798.

[22] Id. at 803 fn. 10.

[23] *Purple Communications*, supra, slip op. at 22–24 (Member Miscimarra, dissenting).

[24] Id., slip op. at 24–26 (Member Miscimarra, dissenting).

ployees "certainty beforehand"[25] concerning what they may and may not do, since what qualifies as a "special circumstance" will only be determined after the fact and case by case, following potentially years of Board and court litigation.[26]

For the above reasons, I believe *Purple Communications* was wrongly decided, and I would return to the rule of *Register Guard* that employers may lawfully limit employee use of their employer's email system to business purposes provided they do not discriminate against NLRA-protected communications.[27]

### C. Evaluation of the Respondent's Code-of-Conduct Provisions

#### 1. Section 1.6—Solicitation and Fundraising (2014 and 2015 Versions of the Code of Conduct)

Section 1.6 of both the 2014 and 2015 versions of the Respondent's Code of Conduct provides, in relevant part, that "the use of company resources at any time (emails, fax machines, computers, telephones, etc.) to solicit or distribute, is prohibited." I believe employers have the right to control the uses to which their property is put so long as they do not discriminate against NLRA-protected activity. The facially neutral limitation on the use of the Respondent's property set forth in Section 1.6 does not discriminate against NLRA-protected activity: the use of company resources to solicit or distribute is comprehensively prohibited, regardless of the nature or purpose of the solicitation or distribution. Therefore, I would find the maintenance of Section 1.6 lawful under the Act.

My colleagues find Section 1.6 unlawful on the basis that the blanket prohibition against using the Respondent's email system to solicit or distribute is contrary to the *Purple Communications* presumption that employees have a right to use their employer's email system during nonworking time to engage in NLRA-protected communications. As explained above, I disagree with *Purple Communications* and I would not apply it. I would instead apply the standard set forth in *Register Guard*, and under that standard Section 1.6 is plainly lawful. Accordingly, I would dismiss this allegation.

#### 2. Section 1.8—Employee Privacy (2014 Code of Conduct)

Section 1.8 of the Respondent's 2014 Code of Conduct contains the following "Employee Privacy" provision:

Verizon Wireless acquires and retains personal information about its employees in the normal course of operations, such as for employee identification purposes and provision of employee benefits. You must take appropriate steps to protect all personal employee information, including social security numbers, identification numbers, passwords, financial information and residential telephone numbers and addresses.

You should never access, obtain or disclose another employee's personal information to persons inside or outside of Verizon Wireless unless you are acting for legitimate business purposes and in accordance with applicable laws, legal process and company policies, including obtaining any approvals necessary under these policies.

Under the balancing test described in *William Beaumont*, I believe the Respondent's maintenance of the above rule does not violate Section 8(a)(1). The Respondent has a substantial business interest in safeguarding employee information that it "acquires and retains . . . in the normal course of operations." The Respondent is duty-bound to protect the confidentiality of its employees' personal information to meet its legal obligations and to avoid exposing its employees to fraud, extortion, and identity theft. Nobody can reasonably question the importance of maintaining the confidentiality of information such as social security numbers, identification numbers, passwords, and financial information. Conversely, I believe the adverse impact of the above language on NLRA-protected activity is comparatively slight. Certainly, employees have a protected right to share certain types of information regarding their coworkers when they engage in concerted activity for mutual aid or protection. However, Section 1.8 leaves employees free to share this type of information provided that the information has not been obtained from Verizon Wireless. Consequently, Section 1.8 only restricts the disclosure of employee information—including residential telephone numbers and addresses—acquired and retained by the Respondent. Disclosing information contained in the Respondent's confidential files would not typically be protected by the Act.[28] Moreover, at this

---

[25] *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 679 (1981).

[26] *Purple Communications*, supra, slip op. at 27–28 (Member Miscimarra, dissenting).

[27] See *Register Guard*, 351 NLRB at 1114–1116.

[28] See, e.g., *Asheville School, Inc.*, 347 NLRB 877, 877 fn. 2 (2006) (finding unprotected an accounting employee's disclosure of other employees' confidential salary and wage data); *International Business Machines Corp.*, 265 NLRB 638, 638 (1982) (finding unprotected an employee's distribution of wage information from a confidential document). My colleagues cite *Rocky Mountain Eye Care Center, P.C.*, 363 NLRB No. 34 (2015), which they characterize as standing for the proposition that "in certain circumstances, employees have a Section 7 right to obtain the names and telephone numbers of employees from their employer's records." *Rocky Mountain Eye Care Center* is the excep-

point, the Board is only evaluating the mere maintenance of this Code of Conduct provision, and there is no evidence that the Respondent has applied it to prohibit actual NLRA-protected activity. To the extent a future case presents a situation where Section 1.8 has actually been applied to restrict the exercise of Section 7 rights or to penalize employees who have engaged in NLRA-protected activity, the Board would have the opportunity to independently examine whether the Respondent's reliance on Section 1.8, as applied, violated Section 8(a)(1). See fn. 14, supra and accompanying text.

I would reach the same result under the *Lutheran Heritage* "reasonably construe" standard. The language of

Section 1.8 informs any reasonable employee that the rule only pertains to personal information that the Respondent "acquires and retains in the normal course of operations." That is, employees would understand they are prohibited from "access[ing], obtain[ing], or disclos[ing]" personal information from the Respondent's confidential records and would thus not interpret the rule to prohibit Section 7 activity.[29]

### 3. Section 1.8—Employee Privacy (2015 Code of Conduct)

For the 2015 Code of Conduct, the Respondent revised Section 1.8 as follows:

> You must take appropriate steps to protect confidential personal employee information, including social security numbers, identification numbers, passwords, bank account information and medical information. You should never access or obtain, and may not disclose outside of Verizon, another employee's personal information obtained from Verizon business records or systems unless you are acting for legitimate business purposes and in accordance with applicable laws, legal process and company policies, including obtaining any approvals necessary under those policies.

This version of Section 1.8, implemented at most but not all of the Respondent's facilities, is even more clearly lawful than the 2014 version. The Respondent removed any possible adverse impact on NLRA-protected activity by omitting the reference to "residential telephone numbers and addresses" and making even clearer that the rule prohibits accessing, obtaining, and disclosing "confidential employee information"—such as "social security numbers, identification numbers, passwords, bank account information and medical information," information that is indisputably sensitive—from its "business records or systems." Without *any* impact on NLRA-protected activity to balance against the Respondent's legitimate interests in maintaining the rule, the 2015 revision of Section 1.8 does not violate Section 8(a)(1), and I would reach the same result under the *Lutheran Heritage* "reasonably construe" standard. I therefore

---

tion that proves the rule. In that case, the employer records at issue were contained in a system called Centricity, and the evidence revealed that (i) employees had access to Centricity and were taught how to access it during orientation, (ii) employees accessed Centricity to obtain employees' phone numbers for scheduling and other purposes, and (iii) employees testified that they were told to put their contact information into Centricity in case anyone needed to contact them. Id., slip op. at 10. In that context, the judge found—and the Board adopted the judge's finding—that "the message conveyed to employees, both during orientation and as a matter of practice, was that the [Centricity] system was . . . the place to access employees' contact information." Id. On this basis, the Board concluded that "the gathering of employee first names and phone numbers" from Centricity and the "disclosure of the information to the union agent for organizing purposes fall within Section 7 protected conduct." Id. In the same decision, however, the judge—adopted by the Board—cited several cases (including *International Business Machines,* supra) holding that removing information from *confidential* employer records and doing so outside the normal course of work activity is *not* protected by the Act. This is clearly the type of unprotected conduct that Section 1.8 addresses.

The Board's final rule on representation-case procedures, 79 Fed. Reg. 74308 (Dec. 15, 2014) (Election Rule), supports my view that Section 1.8 is lawful. As revised by the Election Rule, Sections 102.62(d) and 102.67(l) of the Board's Rules and Regulations require the employer to provide the regional director and other relevant parties a voter list containing employee contact information (including "home addresses, available personal email addresses, and available home and personal cellular ('cell') telephone numbers") only at a specified time after certain conditions have been met—i.e., within 2 business days after the regional director approves an election agreement or issues a direction of election. Importantly, the Board's rules mandate that information contained in a voter list may not be used "for purposes other than the representation proceeding, Board proceedings arising from it, and related matters." Although I dissented from the Election Rule along with former Member Johnson, see 79 Fed. Reg. at 74430–74460—including from the Board majority's expansion of required voter-list disclosures to include email addresses and home and personal cellphone numbers, id. at 74452–74454—the limitations described above regarding personal contact information contained in voter lists reflect that the majority, although misguided in the scope of disclosures they required, was nonetheless aware of the risks those disclosures pose for employees and sought to mitigate those risks. Yet my colleagues today anomalously find that an employer interferes with, restrains, or coerces its employees in the exercise of their NLRA-protected rights in violation of Sec. 8(a)(1) if it maintains a rule that limits the circumstances under which employees may obtain and disclose their coworkers' personal contact information—even though the Board itself has imposed safeguards of its own.

---

[29] See, e.g., *Super K-Mart,* 330 NLRB 263, 263–264 (1999) (finding lawful employer's rule providing that "[c]ompany business and documents are confidential. Disclosure of such information is prohibited."). Contrary to the proscription in *Lutheran Heritage* to "refrain from reading particular phrases in isolation," 343 NLRB at 646, my colleagues read the second paragraph of Section 1.8 in isolation from the first paragraph. I believe employees would not do likewise. I think they would reasonably understand that the phrase "another employee's personal information" in the second paragraph refers to the "personal information about . . . employees" that the Respondent "acquires and retains . . . in the normal course of operations" described immediately above in the first paragraph.

10                     DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

concur with my colleagues' finding that the 2015 version of Section 1.8 is lawful.

4. Section 2.1.3—Activities Outside of Verizon Wireless (2014 and 2015 Versions of the Code of Conduct)

Section 2.1.3 of both the 2014 and 2015 versions of the Code of Conduct contains the following language (emphasis added):

> Many employees participate in an individual capacity in *outside organizations* (such as their local school board or homeowners' association). Memberships in these associations can cause conflicts if they require decisions regarding Verizon Wireless or its products. *If you are a member of an outside organization, you must remove yourself from discussing or voting on any matter that involves the interests of Verizon Wireless or its competitors.* You must also disclose this conflict to your outside organization without disclosing non-public company information and you must disclose any such potential conflict to the VZ Compliance Guideline. *Participation in any outside organization should not interfere with your work for Verizon Wireless.* To the extent that your participation infringes on company time or involves the use of Verizon Wireless resources, your supervisor's approval is required.

Balancing respective rights and interests, I believe the above language violates Section 8(a)(1) of the Act. It is possible that Section 2.1.3 was merely intended to address conflicts of interest that have nothing to do with the NLRA—for example, as stated in the first sentence above, where a Verizon employee participates on the local school board. If the local school board decides whether to contract for wireless service with Verizon Wireless or one of its competitors, the Respondent clearly has a substantial interest in ensuring that a Verizon Wireless employee plays no role in that decision. Yet, a central aspect of the NLRA is the possibility that employees may desire to have "outside organizations"—specifically, unions—represent them regarding their wages, hours and terms and conditions of employment. Without a doubt, an employee's participation in such an "outside organization" may "interfere with" his or her work. Specifically, employees have a protected right to engage in a work stoppage, which may "interfere with" their work, and employers cannot lawfully require employees to secure a "supervisor's approval" before engaging in an NLRA-protected strike. For these reasons, I believe that Section 2.1.3—though it advances a legitimate purpose unrelated to the NLRA—has an adverse impact on NLRA-protected activity that outweighs the legitimate interests served by the rule. On this basis, I

concur with my colleagues' finding that the maintenance of Section 2.1.3 violates Section 8(a)(1) of the Act.

5. Section 3.3—Proper Use of Verizon Wireless Property and Property Owned by Others (2014 and 2015 Codes of Conduct)

Both versions of the Code of Conduct contain in Section 3.3 the following provision: "Unless permitted by written company policy, it is never appropriate to use Verizon Wireless machinery, switching equipment or vehicles for personal purposes, or any device or system to obtain unauthorized free or discount services." The General Counsel contends that this rule limits the use of the Respondent's email system during nonworking time for NLRA-protected communications in contravention of *Purple Communications*, supra.

My colleagues dismiss this allegation on the basis that Section 3.3 does not pertain to the Respondent's email system and thus does not implicate *Purple Communications*. I agree that this allegation warrants dismissal, but for reasons different from those relied upon by my colleagues. As explained above, I disagree with *Purple Communications*. Therefore, even assuming Section 3.3 limits the use of the Respondent's email system, there is nothing unlawful, in my view, in a policy that limits the use of an employer's email system to business purposes where, as here, the employer does not discriminate against NLRA-protected activity.

6. Section 3.4.1—Prohibited Activities (2014 and 2015 Versions of the Code of Conduct)

Section 3.4.1 of both the 2014 and 2015 versions of the Code of Conduct contains the following prohibitions regarding the use of the Respondent's email and internet:

> You may never use company systems (such as e-mail, instant messaging, the Intranet or Internet) to engage in activities that are unlawful, violate company policies or result in Verizon Wireless' liability or embarrassment. Some examples of inappropriate uses of the Internet and e-mail include: Pornographic, obscene, offensive, harassing or discriminatory content; Chain letters, pyramid schemes or unauthorized mass distributions; Communications primarily directed to a group of employees inside the company on behalf of an outside organization.

Like Section 1.6 and possibly Section 3.3, Section 3.4.1 limits the use of the Respondent's email system (and other digital systems) for certain non-business purposes without discriminating against NLRA-protected activity by distinguishing between permitted and prohibited uses along Section 7 lines. Applying the standard set forth in *Register Guard*, supra, I would find this rule lawful.

My colleagues find Section 3.4.1 unlawful under *Purple Communications* to the extent that it prohibits the use of the Respondent's email system for "unauthorized mass distributions" and "[c]ommunications primarily directed to a group of employees inside the company on behalf of an outside organization." They find that employees would read Section 3.4.1 to limit the use of the Respondent's email system during nonworking time to engage in NLRA-protected communications. As explained above, I disagree with *Purple Communications*, and I believe employers may lawfully control the use of their email and other digital systems so long as they do not discriminate against NLRA-protected uses.

### 7. Conclusion—Theft or Unauthorized Access, Use, or Disclosure
### (2014 and 2015 Versions of the Code of Conduct)

The "Conclusion" of both the 2014 and 2015 versions of the Code of Conduct begins by informing employees that "[i]t is not possible to describe all unethical or illegal business practices in detail. The best guidelines are individual conscience, common sense and unwavering compliance with all company policies, applicable laws, regulations and contractual obligations." The Conclusion then lists some "examples of actions considered illegal or unacceptable," including "[t]heft or unauthorized access, use or disclosure of company, customer or employee records, data, funds, property or information (whether or not it is proprietary)." The General Counsel contends that the Conclusion is unlawful on the basis that it prohibits "unauthorized access, use or disclosure of . . . employee records, data . . . or information."

I believe this provision is lawful. "[E]mployee records, data . . . or information" includes the types of personal information about employees referenced in Section 1.8, such as Social Security numbers, identification numbers, passwords, financial information, and medical information. As explained above in the discussion of Section 1.8, the Respondent has substantial interests associated with preserving and protecting the confidentiality of these types of information.

The Conclusion is phrased more generally and broadly than Section 1.8. It prohibits any employee's unauthorized "use" or "disclosure" of employee "data" or employee "information." Therefore, the prohibition against using or disclosing "employee data . . . or information" could potentially encompass an employee's disclosure of employment-related terms and conditions of employment, and our statute protects the right of employees to discuss and engage in concerted activities for mutual aid or protection regarding these matters. However, for several reasons, I believe that Respondent's mere inclusion

of this language in its Code of Conduct does not violate the Act.

First, the Conclusion's language—even if interpreted broadly—has a comparatively slight adverse impact on NLRA-protected activity, and I believe it is not reasonable to interpret its language in isolation. The disputed language is set forth in a "Conclusion," which would most reasonably be regarded as a general summary of more detailed restrictions that have preceded it. Therefore, I do not believe the "Conclusion" language can be reasonably construed as an independent source of additional specific rules. This is implied by the Conclusion itself, which states in the first sentence: "It is not possible to describe all unethical or illegal business practices in detail." The second sentence—"[t]he best guidelines are individual conscience, common sense and unwavering compliance with all company policies, applicable laws, regulations and contractual obligations"—reinforces this view of the Conclusion as a general summary. Furthermore, its reference to "applicable laws" would include the NLRA. To the extent that the language of the Conclusion is given a broader interpretation, I believe the Board should still find that it is lawful because (i) the vast majority of conduct potentially covered by the language does not implicate the NLRA, and (ii) the mere existence of ambiguity in an employment policy that has self-evident lawful purposes should not result in a Board finding that it violates the Act. See fns. 9–10, supra and accompanying text. Again, a different situation may be presented if the Respondent applied the Conclusion's language against actual NLRA-protected activity in the future,[30] but the issue here is whether Respondent's mere maintenance of this Code of Conduct language violates Section 8(a)(1) of the Act. Applying the *William Beaumont* standard, I would find it does not.

### 8. Conclusion—Disparagement or Misrepresentation
### (2014 and 2015 Codes of Conduct)

The Conclusion of both the 2014 and 2015 versions of the Code of Conduct also prohibits "[d]isparaging or misrepresenting the company's products or services or its employees." This language contains two distinct prohibitions: (1) a prohibition on disparaging or misrepresenting the Respondent's products or services, and (2) a prohibition on disparaging or misrepresenting the Respondent's employees. I believe the Board should find both prohibitions lawful.

As to the first prohibition, a business's success, even its continued existence, depends to a great extent on its reputation. Thus, substantial interests unrelated to the NLRA warrant protecting the Respondent's commercial

---

[30] See fn. 14, supra and accompanying text.

12                      DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

image from harm that might be inflicted on it by disparagement or misrepresentation of its products or services. Along similar lines, the Board has found that disparagement by employees of an employer's products or services is unprotected by the Act[31] unless the communication "indicate[s] it is related to an ongoing dispute between the employees and the employer and the communication is not so disloyal, reckless, or maliciously untrue as to lose the Act's protection."[32] For this reason, I believe the first prohibition has a potential adverse impact on NLRA-protected activity that is comparatively slight and outweighed by the Respondent's substantial interests.

Second, the Respondent *and* its employees have a legitimate interest in preventing employees from being disparaged and misrepresented by their coworkers. "Disparagement" and "misrepresentation" describe statements that are not merely inaccurate, but that attack the person or convey something untruthful about them. To "disparage" means "to describe (someone or something) as unimportant, weak, bad, etc." or "to lower in rank or reputation," and its synonyms include "badmouth," "belittle," and "put down."[33] To "misrepresent" means "to give a false or misleading representation of usually with an intent to deceive or be unfair."[34] While NLRA-protected activity may involve criticism of coworkers, supervisors, and managers, employees are capable of exercising their Section 7 rights without resorting to disparagement and misrepresentation,[35] and I do not believe Congress intended that Federal law would be violated when an employer advises its employees that they should not disparage or misrepresent each other. For these reasons, I believe the Board should conclude that the Code of Conduct language regarding disparagement and misrepresentation does not violate the Act.

### CONCLUSION

Based on the considerations discussed above, I respectfully dissent in part and concur in part in this case.

---

[31] See *NLRB v. Electrical Workers UE Local 1229 (Jefferson Standard)*, 346 U.S. 464 (1953) (holding that employees were not protected by the Act in making "a sharp, public, disparaging attack upon the quality of [their employer's] product and its business policies, in a manner reasonably calculated to harm the company's reputation and reduce its income").

[32] *Mountain Shadows Golf Resort*, 330 NLRB 1238, 1240 (2000).

[33] See http://www.merriam-webster.com/dictionary/disparage and http://www.merriam-webster.com/thesaurus/disparage (last viewed Feb. 24, 2017).

[34] See http://www.merriam-webster.com/dictionary/misrepresent (last viewed Feb. 24, 2017).

[35] See *Adtranz ABB Daimler-Benz*, 253 F.3d at 27 (an employer does not violate the Act when it demands that its employees "comply with generally accepted notions of civility").

Dated, Washington, D.C.  February 24, 2017

---

Philip A. Miscimarra,          Acting Chairman

NATIONAL LABOR RELATIONS BOARD
APPENDIX
NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union
Choose representatives to bargain with us on your behalf
Act together with other employees for your benefit and protection
Choose not to engage in any of these protected activities.

WE WILL NOT maintain Section 1.6 Solicitation and Fundraising in our 2014 and 2015 Codes of Conduct prohibiting you from "the use of company resources at any time (emails, fax machines, computers, telephones, etc.) to solicit or distribute."

WE WILL NOT maintain Section 1.8 Employee Privacy in our 2014 Code of Conduct requiring you to "take appropriate steps to protect all personal employee information, including . . . residential telephone numbers and addresses," and prohibiting you from "access[ing], obtain[ing] or disclos[ing] another employee's personal information to persons inside or outside of Verizon Wireless unless you are acting for legitimate business purposes and in accordance with applicable laws, legal process and company policies, including obtaining any approvals necessary under these policies."

WE WILL NOT maintain Section 2.1.3 Activities Outside of Verizon Wireless in our 2014 and 2015 Codes of Conduct stating that membership in outside organizations or associations "can cause conflicts if they require decisions regarding Verizon Wireless or its products" and requiring employees who are members of an outside organization to "remove yourself from discussing or voting on any matter that involves the interests of Verizon Wireless or its competitors," "disclose this conflict to your outside organization without disclosing non-public

company information," and "disclose any such potential conflict to the VZ Compliance Guideline."

WE WILL NOT maintain Section 3.4.1 Prohibited Activities in our 2014 and 2015 Codes of Conduct prohibiting you from "us[ing] company systems (such as e-mail, instant messaging, the Intranet or Internet) to engage in activities that . . . result in Verizon Wireless' . . . embarrassment," or a rule listing the following as some examples of inappropriate use of the company systems:

> "[U]nauthorized mass distributions"; and

> "Communications primarily directed to a group of employees inside the company on behalf of an outside organization."

WE WILL NOT maintain the Conclusion in our 2014 and 2015 Codes of Conduct that states that the following are examples of actions considered illegal or unacceptable:

> "Theft or unauthorized access, use or disclosure of company, customer or employee records, data, funds, property or information (whether or not it is proprietary)"; and

> "Disparaging or misrepresenting the company's products or services or its employees."

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of the rights listed above.

WE WILL rescind the above rules (Section 1.6 Solicitation and Fundraising in the 2014 and 2015 Codes of Conduct, Section 1.8 Employee Privacy in the 2014 Code of Conduct, Section 2.1.3 Activities Outside of Verizon Wireless in the 2014 and 2015 Codes of Conduct, Section 3.4.1 Prohibited Activities in the 2014 and 2015 Codes of Conduct, and the two unlawful bullet points in the Conclusion in the 2014 and 2015 Codes of Conduct) at all of our offices and places of business throughout the United States where they are in effect.

WE WILL furnish all of our employees with inserts for the 2014 and 2015 Codes of Conduct presently in effect at their respective offices and places of business that (1) advise that the above rules have been rescinded, or (2) provide the language of lawful rules; or WE WILL publish and distribute revised 2014 and 2015 Codes of Conduct that (1) do not include the above rules, or (2) provide the language of lawful rules.

CELLCO   PARTNERSHIP   D/B/A   VERIZON WIRELESS

The   Board's   decision   can   be   found   at www.nlrb.gov/case/28-CA-145221 or by using the QR code

below.  Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1015 Half Street, S.E., Washington, D.C. 20570, or by calling (202) 273–1940.



*Alexander J. Gancayco, Esq.*, for the General Counsel.
*E. Michael Rossman, Esq*, for the Respondent.

### DECISION

MARY MILLER CRACRAFT, Administrative Law Judge. This case was submitted pursuant to the parties' joint motion and stipulation of facts, accepted and approved on August 4, 2015.[1] The complaint, as amended, alleges that Cellco Partnership d/b/a Verizon Wireless (Respondent or Verizon Wireless) violated Section 8(a)(1)[2] of the National Labor Relations Act (the Act) by maintaining certain handbook rules which interfere with, restrain, or coerce employees in the exercise of rights guaranteed in Section 7[3] of the Act.

On the entire record and after considering the briefs filed by counsel for the General Counsel and counsel for Respondent, the following findings of fact and conclusions of law are made.

#### I. JURISDICTION

Respondent is a Delaware general partnership with a principal office and place of business located in Basking Ridge, New Jersey. It has offices and places of business throughout the United States where it is engaged in the business of providing wireless telecommunications

services throughout the United States including an office and place of business located in Chandler, Arizona. The parties stipulate that Respondent is engaged in interstate commerce pursuant to the Board's retail jurisdictional standard. Thus, the parties further stipulate and I find that Respondent is an employer engaged in commerce within the meaning of Section 2(2), (6), and (7) of the Act. Thus, this dispute affects commerce and the Board has jurisdiction of this case pursuant to Section 10(a) of the Act.

---

[1] Charging Party Sarah Parrish filed the underlying unfair labor practice charge on January 28, 2015. Complaint issued on April 30, 2015.

[2] Sec. 8(a)(1) of the Act, 29 U.S.C. §158(a)(1), provides, "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of the Act."

[3] Sec. 7 of the Act, 29 U.S.C. §157, provides inter alia that, "Employees shall have the right to self-organization . . . and to engage in other concerted activities for the purposes of . . . mutual aid or protection. . . ."

14                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

II. UNLAWFUL RULES ALLEGATIONS

### A. Facts in General

Respondent promulgated its 2014 Code of Conduct prior to August 2014. Until April 29, 2015, Respondent maintained the 2014 Code of Conduct at all of its offices throughout the United States. On or about April 29, 2015, Respondent promulgated the 2015 Code of Conduct. Since that time, Respondent has maintained the 2015 Code of Conduct at most of its other offices and places of business throughout the United States. At a handful of Respondent's facilities, the 2014 Code of Conduct remains in place.

Four of the five rules at issue in this proceeding were maintained in identical wording in the 2014 Code of Conduct and the 2015 Code of Conduct. Thus, the 2015 Code of Conduct retains without change the prior 2014 Code of Conduct provisions Section 1.6 Solicitation and Fundraising, Section 2.1.3 Activities Outside of Verizon Wireless, Section 3.3 Proper Use of Verizon Wireless' Property and Property Owned by Others, and Section 3.4.1 Prohibited Activities. However, a fifth rule, Section 1.8 Employee Privacy, was altered in the 2015 Code of Conduct. Both the 2014 and the 2015 versions of the Employee Privacy provisions are alleged to be unlawful.

### B. Standard of Review in General

By its literal terms, Section 7 provides employees with "the right to self-organization" and the right to act together for their "mutual aid or protection." These words have been interpreted to protect employees right to communicate with each other regarding their workplace terms and conditions of employment.[4] Thus, the guarantee of Section 7 rights includes not only the right of employees to discuss organization but also the right to discuss wages, hours, and terms and conditions of employment.[5]

If a work rule would reasonably tend to chill employees in the exercise of their Section 7 rights, it will violate Section 8(a)(1) of the Act. *Hyundai America Shipping Agency*, 357 NLRB 860, 861 (2011); *Lafayette Park Hotel*, 326 NLRB 824, 825 (1998), enfd. 203 F.3d 52 (D.C. Cir. 1999). A violation may occur merely by maintenance of such a rule—even in the absence of enforcement. *Lafayette Park Hotel*, supra; see also, *Cintas Corp.*, 344 NLRB 943 (2005), enfd.482 F.3d 463 (D.C. Cir. 2007).

A rule which explicitly restricts Section 7 rights is unlawful. *Lutheran Heritage Village-Livonia*, 343 NLRB 646 (2004). In the absence of explicit restriction, a violation will nevertheless be found if (1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict Section 7 rights. Id. at 646–647. There is no allegation that any of these rules were promulgated in response to union activity or to restrict Section 7 rights. Thus, the sole

inquiry here is whether employees would reasonably construe the language to prohibit Section 7 activity. In determining whether a challenged rule is unlawful, the rule must be given a reasonable reading and particular phrases may not be read in isolation. *Lafayette Park*, supra, 326 NLRB at 825, 827. In other words, there is no presumption of improper interference with employee rights. Id.

### C. 2014 and 2015 Code of Conduct Section 1.6 Solicitation and Fundraising

Solicitation and fundraising distract from work time productivity, may be perceived as coercive and may be unlawful.

Solicitation during work time (defined as the work time of either the employee making or receiving the solicitation), the distribution of non-business literature in work areas at any time or the use of company resources at any time (emails, fax machines, computers, telephones, etc.) to solicit or distribute, is prohibited. Non-employees may not engaged in solicitation or distribution of literature on company premises. The only exception to this policy is where the company has authorized communications relating to benefits or services made available to employees by the company, company-sponsored charitable organizations or other company-sponsored events or activities. To determine whether a particular activity is authorized by the company, contact the VZ Compliance Guideline.[6]

In *Purple Communications, Inc.*, 361 NLRB No. 126, slip op. at 1 (2014), the Board held that "employee use of email for statutorily protected communications on nonworking time must presumptively be permitted by employers who have chosen to give employees access to their email." Thus, the Board overruled *Register Guard*,[7] which held employees have no right to use their employer's email system for Section 7 purposes, as "clearly incorrect" because it focused too much on employer property rights and "too little on the importance of email as a means of workplace communications." Id. The parties stipulated that Respondent customarily communicates with its employees by email and through an intranet system.

Respondent's rule specifically prohibits use of company resources (emails, fax machines, computers, telephones, etc.) to solicit or distribute at any time. This rule is contrary to the *Pur-*

---

[4] *Parexel International, LLC*, 356 NLRB 516, 518 (2011), citing *Aroostook County Regional Ophthalmology Center*, 317 NLRB 218, 220 (1995), enfd. in part 81 F.3d 209 (D.C. Cir. 1996) (discussions regarding wages, the core of Section 7 rights, are the grist on which concerted activity feeds).

[5] *Central Hardware Co. v. NLRB*, 407 U.S. 539, 542, 543 (1972).

[6] The Compliance Guideline is referred to in the Code of Conduct as an 800 number to call to report anonymous or confidential complaints or inquiries; reports of discrimination or harassment; questions or concerns about financial statements, reporting, accounting, internal accounting controls or auditing; claims of harassment; workplace safety and environment concerns; arrest for a felony or crime of dishonesty, assault or battery, drug-related or alcohol-related offense; potential conflicts of interest; request for approval of outside employment; misleading, erroneous, or falsified financial records; improper disclosure of nonpublic information; wage claims; unauthorized disclosure of customer information; to seek approval of a gift worth more than $100, entertainment worth more than $200, or a gift of travel; and for certain issues regarding export and foreign transactions. An Office of Integrity and Compliance is referred to in the introduction of the Code of Conduct. Use of the Compliance Guideline is suggested if a supervisor refuses to modify a request that an employee violate the Code.

[7] 351 NLRB 1110 (2007), enfd. in relevant part and remanded sub nom. *Guard Publishing v. NLRB*, 571 F.3d 53 (D.C. Cir. 2009).

CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS                          15

*ple Communications* presumption that employees have a right to use Respondent's email system to engage in Section 7 communications during their nonworking time.[8] No special circumstances are present nor does Respondent argue that special circumstances justify a restriction in order to maintain production and discipline.

Respondent's rule prohibits both solicitation and distribution. In *Purple Communications,* the Board explained that email "is fundamentally a forum for communication."[9] The Board found it inappropriate to treat email as "solicitation" or "distribution" per se,[10] recognizing that as a forum of communication it constituted solicitation, literature or information, distribution or merely communication that is none of those but nevertheless constitutes protected, concerted activity.[11] Thus both the prohibition on solicitation as well as the prohibition of distribution contravene the holding of *Purple Communications.*

Accordingly, I find that since August 2014, Respondent has violated Section 8(a)(1) of the Act by maintenance its 2014 and 2015 Code of Conduct Section 1.6 Solicitation and Fundraising policy that prohibits employees' use of its email system to engage in solicitation or distribution including Section 7-protected communications during nonworking time.

### D. 2014 Code of Conduct Section 1.8 Employee Privacy

Since at least August 2014, the Employee Privacy Code of Conduct has provided:

> Verizon Wireless acquires and retains personal information about its employees in the normal course of operations, such as for employee identification purposes and provision of employee benefits. You must take appropriate steps to protect all personal employee information, including social security numbers, identification numbers, passwords, financial information and residential telephone numbers and addresses.
>
> You should never access, obtain or disclose another employee's personal information to persons inside or outside of Verizon Wireless unless you are acting for legitimate business purposes and in accordance with applicable laws, legal process and company policies, including obtaining any approvals necessary under these policies.

Relying on *Cintas Corp v. NLRB.,* 482 F.3d 463, 468–469 (D.C. Cir. 2007) and *Fresh & Easy Neighborhood Market,* 361 NLRB No. 8, slip op. at 2–3 (2014), the General Counsel contends that this rule interferes with employees' right to communicate about their terms and conditions of employment and would be reasonably understood to prohibit employees from disclosing employee personal information as part of union organizing or for other protected, concerted activities. Respondent, on the other hand, argues that the rule is lawful. Noting that it extends to "financial information and residential telephone numbers and addresses," Respondent argues that this prohibi-

tion was limited only to information that it acquired and retained in the normal course of operations. Thus, Respondent claims it may protect the information it has obtained and retained in its own files.

Employers have a substantial and legitimate interest in maintaining the privacy of certain business information. *Super K-Mart,* 330 NLRB 263 (1999); *Lafayette Park Hotel,* 326 NLRB 824, 826 (1998), enfd 203 F3d 52 (D.C. Cir. 1992). Thus, prohibitions on disclosing confidential information are lawful if, viewed in context, employees would not reasonably understand that Section 7-related activity was proscribed by the rule. *Super K-Mart,* supra, (rule would be understood to protect employer's legitimate interest in confidentiality of its private information such as guest information, trade secrets, and contracts with suppliers); *Lafayette Park Hotel,* supra (rule prohibiting disclosure of hotel-private information would not be reasonably understood to proscribe Section 7-related activity).

The 2014 Code of Conduct Employee Privacy rule is broadly worded and, in my view, would be reasonably read to prohibit employees from discussing wages, hours, and terms and conditions of employment or disclosing employee information to a labor organization or for other protected, concerted activity. Similar rules have been held unlawful. For instance, in *MCPc, Inc.,* 360 NLRB No. 39, slip op. 1 (2014), the Board found a rule prohibiting distribution of personal or financial information, etc., would reasonably be construed to prohibit discussion of wages or other terms and conditions of employment with coworkers—activity protected by Section 7 of the Act.[12]

Further, I take administrative notice that in a prior case involving the same rule, the administrative law judge found a violation.[13] Thus I find that since August 2014 until April 29, 2015 at all but a handful of facilities, Respondent violated Section 8(a)(1) of the Act by maintaining the 2014 Code of Conduct Section 1.8 Employee Privacy. At the handful of facilities where the 2014 Code of Conduct Section 1.8 Employee Privacy is still in effect, the violation continues to date.

### E. 2015 Code of Conduct Section 1.8 Employee Privacy

Since April 29, 2015, Respondent has maintained the following employee privacy rule:

> You must take appropriate steps to protect confidential personal employee information, including social security numbers, identification numbers, passwords, bank account information and medical information. You should never access or obtain, and may not disclose outside of Verizon, another em-

---

[8] In a pre-*Purple Communications* decision, Administrative Law Judge William Nelson Cates analyzed an identical rule and found that it did not violate the Act. See *Verizon Wireless,* JD(ATL)–24–14 (July 25, 2014), pending on exceptions before the Board.

[9] *Purple Communications,* supra, slip op. at 11.

[10] *Purple Communications,* supra, slip op. at 12.

[11] *Purple Communications,* supra, slip op. at 12–13.

[12] See also, *Hyundai,* supra, 357 NLRB 860, 871 (prohibition of disclosure of any information exchanged on company email, instant messages, and phone systems would reasonably include wage and salary information, disciplinary actions, performance evaluations and other information of common concern to employees); and *Cintas Corp.,* 344 NLRB 943, 943 (2005), enfd. in relevant part 482 F.3d 463 (D.C. Cir. 2007) (rule's unqualified prohibition of the release of "any information" regarding "its partners" could be reasonably construed by employees to restrict discussion of wages and other terms and conditions of employment).

[13] *Verizon Wireless,* JD(ATL)–24–14 (July 25, 2014), Administrative Law Judge William Nelson Cates, JD 9:33–10:43, pending on exceptions to the Board.

ployee's personal information obtained from Verizon business records or systems unless you are acting for legitimate business purposes and in accordance with applicable laws, legal process and company policies, including obtaining any approvals necessary under those policies.

The General Counsel alleges that this rule is overbroad because it would be reasonably understood to require employees to protect personal employee information noting there is no limitation to make it clear that the rule does not restrict information implicating Section 7 concerns. Thus, the General Counsel argues, an employee would not understand whether terms and conditions of employment were encompassed within the rule. Further, the General Counsel contends that the restriction on disclosure of "personal information obtained from Verizon business records" is overly broad because it would reasonably be read to bar employees from obtaining time card or schedule information, disciplinary information, and personnel records in furtherance of an organizing campaign or other concerted activity.

Respondent argues that the 2015 rule is clearly aimed at preserving the confidentiality of social security numbers, identification numbers, passwords, bank account information and medical information. Relying on *Super K-Mart*, supra, Respondent asserts that employees would readily understand that the rule was designed to protect the legitimate employer interest in confidentiality of private information. Further Respondent notes that the rule does not prohibit employees from discussing wages or working conditions. Thus, Respondent claims that when read in context, it is clear that the scope of the rule is narrow: social security numbers, identification numbers, passwords, bank account information and medical information. Thus, Respondent concludes that it would be unreasonable to extend the scope of the rule.

In *Super K-Mart*, supra, the employer's rule provided, "Company business and documents are confidential. Disclosure of such information is prohibited." In *Lafayette Park*, supra, the employer's rule precluded, "Divulging Hotel-private information to employees or other individuals or entities that are not authorized to receive that information." In both instances, the Board noted that the rules did not explicitly preclude discussion of wages or working conditions. Thus, the Board held that those rules were lawfully addressed to protecting the employers' legitimate business interest and did not implicate employees' Section 7 rights.

Similarly, I am convinced that when read in context, Respondent's 2015 Code of Conduct Section 1.8 Employee Privacy would not be understood to implicate employees' Section 7 rights. The rule has two sentences. In the first sentence, the phrase "confidential personal employee information" specifically includes "social security number, identification numbers, passwords, bank account information and medical information." This information is legitimately protected confidential information. Possible ambiguity might have resulted if the first sentence of the rule specifically recited typical expansive language such as "including but not limited to." But here the first sentence uses the term "including." A literal reading of the second sentence might fault it for changing the first sentence's

term "confidential personal employee information" to "employee's personal information." Redundancy of the first sentence term in the second sentence would have provided a positive indication that the second sentence referred to the same phrase and the same specific information used in the first sentence. However, a reasonable reading of the first and second sentences in context indicates that the same information is referenced in both sentences. That is, reasonable reading of the second sentence in context is that employees should never access, obtain, or disclose another employee's social security number, identification number, password, bank account information, or medical information unless acting for legitimate business purposes. Thus I find that Respondent's 2015 Code of Conduct Section 1.8 Employee Privacy does not tend to chill Section 7 activity and does not violate Section 8(a)(1).

### F.  2014 and 2015 Code of Conduct Section 2.1.3 Activities Outside of Verizon Wireless

Section 2 of the Code of Conduct (2014 and 2015) is entitled "Maintaining Integrity and Fairness in the Workplace. Section 2.1 "Avoiding Conflicts of Interest" states "You must disclose any potential or actual conflict to the Compliance Guideline. This chapter addresses some of the most common conflicts." A series of questions and answers is set forth in the left margin of the section. One such question is "I need to make extra money and I want to get a second job. Is this a problem?" The answer: "This may create a conflict of interest if your second job provides any of the same types of services or products as Verizon Wireless, compromises Verizon Wireless's interests or adversely affects your job performance."

Section 2.1.1 sets forth personal conflicts of interest while Section 2.1.2 sets forth conflicts which might arise from employment outside of Verizon Wireless. Section 2.1.3 (the first paragraph of this section is at issue here) is entitled "Activities Outside of Verizon Wireless." The Code continues with Section 2.2 regarding political conflicts of interest, Section 2.2.1 regarding personal political interests, Section 2.2.2 dealing with contributions of corporate assets, and Section 2.2.3 regarding seeking public office. Section 2.3 deals with insider trading.

Situated midway in Section 2, the first paragraph of Section 2.1.3 provides,

Many employees participate in an individual capacity in outside organizations (such as their local school board or homeowners' association). Memberships in these associations can cause conflicts if they require decisions regarding Verizon Wireless or its products. If you are a member of an outside organization, you must remove yourself from discussing or voting on any matter that involves the interests of Verizon Wireless or its competitors. You must also disclose this conflict to your outside organization without disclosing non-public company information and you must disclose any such potential conflict to the VZ Compliance Guideline. Participation in any outside organization should not interfere with your work for Verizon Wireless. To the extent that your participation infringes on company time or involves the use of Verizon Wireless resources, your supervisor's approval is required.

The General Counsel argues that this rule is impermissibly

overbroad because it can reasonably be read to indicate that a conflict of interest is created by engaging in Section 7 activities. Second, the General Counsel asserts that the ban on disclosing non-public information is overly broad. Finally, the General Counsel contends that rules requiring employees to disclose their protected activities to their employer are unlawful.

Respondent contends that the clause is lawful and notes that contextually it is in the Code of Conduct section on "Maintaining Integrity and Fairness in the Workplace." Other rules in this section deal with supervision of an employee with whom the supervisor shares a close personal friendship; maintaining separate employment with a vendor, supplier, contractor, subcontractor or competitor; violating campaign finance laws; insider trading; and transacting business in securities or derivatives of a company with which one conducts or supervises business on Verizon's behalf. Thus, Respondent asserts that in context employees would construe Section 2.1.3 as related to potential negative impact on business judgments due to outside activities. Further context is provided in Code Section 2.3.1 which deals with legal and ethical conflicts and details the types of "outside organizations" listed civic groups such as local school boards, homeowners associations and public and non-public corporations. Based on this contextual setting, Respondent asserts that no reasonable reading would include union membership or any other Section 7 activity was prohibited. Respondent cites *Copper River of Boiling Springs, LLC,* 360 NLRB No. 60, slip op. at 13 (2014) (statement of purpose of rule as a whole suggests contours of its application).

Read literally and in context, the rule does not tend to chill Section 7 activities. First, the literal language of the rule clearly indicates that the conflict of interest addressed is in making decisions about Verizon Wireless or its products as a member of an outside organization while being employed by Verizon Wireless. Thus, the language is clearly addressed to the ethics of a business decision. Second, the context of the rule clearly indicates that the conflicts of interest it addresses are those created by or related to commercial competition. The rule is not linked to other rules prohibiting participation in outside activities that are detrimental to the employer's image or reputation.

Thus, the rules held to be overly broad in *The Sheraton Anchorage,* 362 NLRB No. 123, slip op. at 1 fn.4 (2015) and *First Transit, Inc.,* 360 NLRB No. 72, slip op. at 2, fn.5 (2014) are distinguishable by their context and the overall circumstances. In *The Sheraton Anchorage, supra,* the rule, "I understand that conflict of interest with the hotel or company is not permitted," was applied to discharge employees engaged in Section 7 activity. The Board found it was overbroad particularly when considered with other overly broad rules prohibiting participation in outside activities that are detrimental to the company's image or reputation.

Similarly, in *First Transit, supra,* the "disloyalty" rule was situated with other rules regarding making false, vicious, or malicious statements concerning the company or coworkers and conduct during non-working hours detrimental to the interest or reputation of the company. 360 NLRB No. 72, slip op. at 11. The Board noted that the rule was overly broad and did not focus on "uncooperative, improper, unlawful or otherwise un-

protected employee misconduct" which would be understood not to include protected activity. Id, slip op. at 2, fn. 5.

Thus in both *The Sheraton Anchorage* and *First Transit,* the focus of the rules was on stand-alone misbehavior rather than, as here: supervising those with whom one has a close personal relationship (2.1.1 Personal Conflicts of Interest), second jobs (Section 2.1.2 Employment Outside Verizon Wireless), political contributions and activities (Section 2.2 Personal Political Interests), or insider trading (Section 2.3 Insider Trading and Financial Interests).

In this respect, Section 2.1.3 is somewhat similar to the rule examined in *Tradesmen International,* 338 NLRB 460, 460–461 (2002). That rule prohibited employees from engaging in any activity that conflicted with or appeared to conflict with the interests of the company, prohibited any illegal restraints of trade, and required employees to avoid conflicts of interest and to refer questions and concerns about potential conflicts to the employer. The Board held that employees would not reasonably fear that they would be punished for engaging in Section 7 activities based on the language and context of the rule. Cf., *Rio All-Suites Hotel & Casino,* 362 NLRB No. 190, slip op. at 1 (2015) ("extraordinarily broad" confidentiality rule prohibiting sharing any information about the employer which has not already been shared with the public clearly implicated terms and conditions of employment); *Hills & Dales General Hospital,* 360 NLRB No. 70, slip op. at 2 (2014) (distinguishing *Tradesmen International* which did not include closely related unlawful provisions).

The General Counsel also takes issue with Section 2.1.3's ban on disclosing non-public company information. The relevant text:

> If you are a member of an outside organization, you must [appropriately recuse yourself]. You must also disclose this conflict to your outside organization without disclosing nonpublic company information and you must disclose any such potential conflict to the Compliance Guideline.

According to the General Counsel, this language leaves employees with the impression that they cannot disclose non-public information about Respondent, their coworkers, or their terms and conditions of employment as part of an organizing campaign or for other protected, concerted activity. The General Counsel asserts that rules broadly prohibiting disclosure of non-public information are overly broad. relying on *Rio All-Suites Hotel & Casino,* 362 NLRB No. 190, slip op. at 2–3 ("extraordinarily broad" confidentiality rule precluding sharing, among other things, salary structures clearly implicates terms and conditions of employment); and *Flamingo Hilton-Laughlin,* 330 NLRB 287, 288 fn.3, 291–292 (1999) (code of conduct prohibiting employees from revealing confidential information about customers, hotel business, or fellow employees violates Sec. 8(a)(1)).

When read in context, the requirement in Section 2.1.3 that an employee who is a member of an outside organization must disclose to the outside organization his or her employment with Verizon Wireless without disclosing nonpublic information must be construed as a part of the business ethics policy. After all, the rule has nothing to do with membership in a labor or-

ganization and it strains logic to read the rule as requiring that an employee who joins a labor organization is constrained to reveal that he or she is employed with Verizon Wireless. The requirement that employment be revealed without disclosing nonpublic information is clearly linked to discussing or voting on a matter related to Verizon Wireless or its products. The preclusion on disclosing nonpublic information must be construed and understood in this context. And so observed, the prohibition is not remotely linked to discussing wages, hours, or terms and conditions with a labor organization or to further protected, concerted activity.

Similarly, the General Counsel's argument that the reporting requirement to Compliance Guideline is unlawful must be rejected. The General Counsel cites *Ivy Steel & Wire, Inc.,* 346 NLRB 404, 442 (2006); *Saginaw Control & Engineering, Inc.,* 339 NLRB 541, 552 (2003); and *TeleTech Holdings, Inc.,* 333 NLRB 402, 403 (2001). Certainly, as is noted in these cases, rules requiring that employees disclose their protected activities to their employer are unlawful. However, a clear, contextual reading of Section 2.1.3 reveals that it contains no such requirement. A reasonable reading of the rule would not encompass a requirement that protected activity be reported. The rule requires that when an employee's activity in an outside organization requires a vote on whether or not to purchase Verizon Wireless products, the employee must announce the conflict of interest between his/her employment and casting a vote on the issue and then report this conflict of interest to Compliance Guideline.[14]

Thus, I find that Section 2.1.3 does not chill Section 7 activity as it is not overly broad and would not be reasonably read to preclude Section 7 activities. I find that the prohibition on disclosure of nonpublic company information does not relate to wages, hours, or terms and conditions of employment and thus does not infringe Section 7 activity. I further find that Section 2.1.3 does not require reporting protected activity to Respondent.

### G.  2014 and 2015 Code of Conduct Section 3.3 Proper Use of Verizon Wireless' Property and Property Owned by Others

Unless permitted by written company policy, it is never appropriate to use Verizon Wireless machinery, switching equipment or vehicles for personal purposes, or any device or system to obtain unauthorized free or discount services.

The General Counsel contends that this rule runs afoul of *Purple Communication,* supra, in that prohibiting use of employer machinery for personal use must include the employer email system for Section 7-related purposes on nonwork time. Respondent claims that the rule prohibits employees from manipulating the network to steal wireless service and, more generally, prohibits misappropriating switching equipment, machinery, and infrastructure. Respondent avers that the rule is lawful because it applies to company property which employees do not have a right to use for reasons not related to work. Respondent does not address the General Counsel's concern

about "machinery" being susceptible of meaning email systems.

Section 3 of the Code, Protecting Verizon Wireless' Assets and Reputation, contains provisions for accurate record keeping; promotion of transparent and complete disclosure; retaining company records; safeguarding company information; protecting non-public company information; company benefits, property and funds; work time; protecting company communications and information systems; prohibited activities; security of facilities, intellectual property, and handling external communications.

Section 3.3 indicates that company switching equipment, vehicles, and "machinery" cannot be used for personal purposes. In the context of switching equipment and vehicles, it is not reasonable to assume that machinery includes email systems. This is especially true when Section 3.4.1 specifically deals with use of email systems. Thus, I find that Section 3.3 does not tend to chill Section 7 activity because it cannot be reasonably read to prohibit use of email systems.

### H.  2014 and 2015 Code of Conduct Section 3.4.1 Prohibited Activities

You may never use company systems (such as e-mail, instant messaging, the Intranet or Internet) to engage in activities that are unlawful, violate company policies or result in Verizon Wireless' liability or embarrassment. Some examples of inappropriate uses of the Internet and e-mail include: Pornographic, obscene, offensive, harassing or discriminatory content; Chain letters, pyramid schemes or unauthorized mass distributions; Communications primarily directed to a group of employees inside the company on behalf of an outside organization.

As previously discussed, in *Purple Communications, Inc.,* supra, the Board held that "employee use of email for statutorily protected communications on nonworking time must presumptively be permitted by employers who have chosen to give employees access to their email." The parties stipulated that Respondent customarily communicates with its employees by email and through an intranet system. A reasonable reading of Section 3.4.1 is that employees will be disciplined for using company email to communicate with a group of employees inside the company on behalf of a labor organization or employees engaged in protected, concerted activity if such use will result in Verizon's "embarrassment." Not only does such language contravene *Purple Communications,* it is also overly broad in the use of embarrassment as a cause of discipline in use of email, instant messaging, intranet or internet.[15] Thus, on its face, this language chills Section 7 activity and violates Section 8(a)(1) of the Act.

---

[14] The General Counsel also argues that Section 2.1.3 infringes on employee use of email on nonworking time. Further elucidation was not set out. This argument is rejected as without basis.

[15] See cases cited by the General Counsel including *The Sheraton Anchorage,* supra, 362 NLRB No. 123, slip op. at 1 (rule prohibiting behavior that publicly embarrasses employer unlawful); *Triple Play Sports Bar& Grille,* 361 NLRB No. 31 (2014) (rule prohibiting inappropriate discussion on social media overly broad). Judge Cates examined a portion of this rule and found it lawful under pre-*Purple Communications* authority. *Verizon Wireless,* JD(ATL)–24–14 (July 25, 2014), Administrative Law Judge William Nelson Cates, JD 13:2–36, pending on exceptions to the Board.

*I. 2014 and 2015 Code of Conduct: Conclusion:*

Two portions of the Code of Conduct Conclusion are alleged to be overly broad. The entire Conclusion is set forth below. The two portions alleged to be overly broad are underlined.

CONCLUSION

It is not possible to describe all unethical or illegal business practices in detail. The best guidelines are individual conscience, common sense and unwavering compliance with all company policies, applicable laws, regulations and contractual obligations. Seek guidance if you are unsure of what to do, ask questions and report wrongdoing. Company policy strictly forbids any retaliation against an employee who reports suspected wrongdoing.

Violations of the law, the Code and other company policies, procedures, instructions, practices and the like can lead to disciplinary action up to and including termination of employment. Such disciplinary action may also be taken against supervisors or executives who condone, permit or have knowledge of improper conduct or fail to take action to prevent and detect violations, such as failure to provide training and failure to supervise subordinates' work. No one may justify an illegal or improper act by claiming it was ordered by someone in higher management. The following are examples of action considered illegal or unacceptable.

- <u>Theft or unauthorized access, use or disclosure of company, customer or employee records, data, funds, property or information (whether or not it is proprietary);</u>
- Working under the influence of alcohol or illegal substances or abusing legal substances;
- Improperly operating a vehicle for company business, or driving while on company business with a suspended or revoked license, or while under the influence of drugs or alcohol;
- Using any program or promotion in an unauthorized manner;
- Engaging in any form of workplace violence, including, but not limited to, any act of physical intimidation or assault, including threats of violence;
- Soliciting or giving the impression that you would expect gifts or gratuities from suppliers or customers;
- <u>Disparaging or misrepresenting the company's products or services or its employees;</u>
- Falsifying a company record such as a time report; and
- Misrepresenting your health status or other reasons for absence, such as misrepresenting yourself as disabled and receiving disability benefits.

The General Counsel alleges the two underlined portions of the Conclusion are overly broad because they would reasonably be understood to prohibit Section 7 communications. Regarding unauthorized disclosure of employee information, the General Counsel contends the language would reasonably be understood

to preclude discussion of wages, hours, and terms and conditions of employment relying on *Fresh & Easy Neighborhood Market,* supra, 361 NLRB No. 8, slip op. at 2–3 (employees would reasonably construe admonition to keep employee information secure to prohibit discussion and disclosure of information about other employees, such as wages and terms and conditions of employment), among other cases. Regarding disparaging company products, services, or employees, the General Counsel asserts the rule is overbroad relying on *Lily Transp. Corp.,* 362 NLRB No. 54 (2015) (rule prohibiting posting of "disparaging, negative, false, or misleading information or comments" about the employer or its employees unlawful) and other similar cases.

Respondent argues that each of the bulleted items, read in context, is informed by confidentiality rules contained elsewhere in the Code and that these items should not be construed in isolation. Respondent, citing *NLRB v. Eletrical Workers Local 1229,* 346 U.S. 464, 475–477 (1953), asserts that the Act does not preclude rules prohibiting disparagement of products and services. Respondent claims that a reasonable employee reading the disparagement language would understand it to apply to products and services and the term "employees" in the context of products and services interactions and would also be understood contextually to relate to unlawful discrimination.

In agreement with the General Counsel, the underlined portions of the Conclusion are overly broad. When read in context, the rule prohibiting "disclosure of company, customer or employee records, data, funds, property or information (whether or not it is proprietary)" would reasonably be understood to preclude discussion of wages, hours, and terms and conditions of employment. Similarly, the rule prohibiting "disparaging or misrepresenting the company's products or services or its employees" is too broad and would reasonably be read to mean that employees could not speak to their coworkers and voice criticism of managers. Thus, it tends to chill legitimate Section 7 activity and violates Section 8(a)(1) of the Act.

CONCLUSIONS OF LAW

1. Since August 2014, by maintenance of its 2014 and 2015 Code of Conduct Section 1.6 Solicitation and Fundraising rule which prohibits employees' use of its email system to engage in solicitation or distribution including Section 7-protected communications during nonworking time, Respondent has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

2. Since August 2014 until April 29, 2015, and at a handful of locations continuing to date, by maintenance of its 2014 Code of Conduct Section 1.8 Employee Privacy which would be reasonably read to prohibit employee discussion of wages, hours, and terms and conditions of employment, Respondent has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) and Section 2(6) and (7) of the Act.

3. Respondent's 2015 Code of Conduct Section 1.8 Employee Privacy in effect since April 29, 2015 at all but a handful of locations does not tend to chill employees in the exercise of their Section 7 rights because employees would not reasonably construe the language to prohibit Section 7 activity.

4. Respondent's 2014 and 2015 Code of Conduct Section 2.1.3 Activities Outside of Verizon Wireless in effect since August 2014 and April 29, 2015, respectively, does not tend to chill employees in the exercise of their Section 7 rights because employees would not reasonably construe the language to prohibit Section 7 activity.

5. Respondent's 2014 and 2015 Code of Conduct Section 3.3 Proper Use of Verizon Wireless' Property and Property Owned by Others in effect since August 2014 and April 29, 2015, respectively, does not tend to chill Section 7 activity because it cannot be reasonably read to prohibit use of email systems.

6. Respondent's 2014 and 2015 Code of Conduct Section 3.4.1 Prohibited Activities in effect since August 2014 and April 29, 2015, respectively, contravenes *Purple Communications* and it is also overly broad in the use of "embarrassment" as a cause for discipline in use of email, instant messaging, intranet, and internet. Thus, on its face, this language chills Section 7 activity and violates Section 8(a)(1) of the Act

7. Respondent's 2014 and 2015 Code of Conduct Conclusion rule in effect since August 2014 and April 29, 2015, respectively, prohibiting "disclosure of company, customer or employee records, data, funds, property, or information (whether or not it is proprietary)" would reasonably be understood to preclude discussion of wages, hours, and terms and conditions of employment. Similarly, the rule prohibiting "disparaging or misrepresenting the company's products or services or its employees" is too broad and would reasonably be read to mean that employees could not speak to their coworkers and voice criticism of managers. Thus, these two items in the Conclusion violate Section 8(a)(1) of the Act.

### REMEDY

Having found that the Respondent has engaged in certain unfair labor practices, I shall order it to cease and desist therefrom and to take certain affirmative action designed to effectuate the policies of the Act. Respondents shall further be ordered to refrain from in any like or related manner abridging any of the rights guaranteed to employees by Section 7 of the Act.

Within 14 days, at all of its facilities where the unlawful policies are or have been in effect,[16] Respondent shall rescind the portions of 2014 (where it is still in effect) and 2015 Code of Conduct Sections 1.6, 1.8, 3.4.1, and the Conclusion to the extent these sections have been found unlawful. See, e.g., *Guardsmark, LLC,* 344 NLRB 809, 812 (2005), and cases cited therein. Respondent may comply with the Order by rescinding the unlawful provisions and republishing its employee handbook without them. The Board recognizes, however, that republishing the handbook could entail significant costs. Accordingly, the Respondent may supply the employees either with handbook inserts stating that the unlawful rules have been rescinded, or with new and lawfully worded rules on adhesive backing which will cover the old and unlawfully broad rules, until it republishes the handbook without the unlawful provisions.

Thereafter, any copies of the handbook that are printed with the unlawful rules must include the new inserts before being distributed to employees." *Guardsmark,* 344 NLRB at 812, fn. 8.

As part of the remedy in this case, Respondent shall post an appropriate informational notice, as described in the attached Appendix. This notice shall be posted nationwide in all Respondents' facilities or wherever the notices to employees are regularly posted for 60 days without anything covering it up or defacing its contents. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means, if Respondent customarily communicate with their employees by such means. In the event that, during the pendency of these proceedings, Respondent has gone out of business or closed a facility involved in these proceedings, Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since August 2014. When the notice is issued to Respondent, it shall sign it or otherwise notify Region 28 of the Board what action they will take with respect to this decision.

On these findings of fact and conclusions of law and on the entire record, I issue the following recommended[17]

### ORDER

Respondent, Cellco Partnership d/b/a Verizon Wireless, Basking Ridge, New Jersey, at all of its facilities nationwide, its officers, agents, successors, and assigns, shall

1. Cease and desist from

(a) Maintaining its 2014 and 2015 Code of Conduct Section 1.6 Solicitation and Fundraising rule which prohibits employees' use of its email system to engage in solicitation or distribution including Section 7-protected communications during nonworking time.

(b) Maintaining its 2014 Code of Conduct Section 1.8 Employee Privacy which would be reasonably read to prohibit employee discussion of wages, hours, and terms and conditions of employment.

(c) Maintaining its 2014 and 2015 Code of Conduct Section 3.4.1 Prohibited Activities which contravenes *Purple Communications* and is also overly broad in the use of "embarrassment" as a cause for discipline in use of email, instant messaging, intranet, and internet.

(d) Maintaining its 2014 and 2015 Code of Conduct Conclusion rule (1) prohibiting "disclosure of company, customer or employee records, data, funds, property or information (whether or not it is proprietary)," which would reasonably be understood to preclude discussion of wages, hours, and terms and conditions of employment and (2) prohibiting comments which are "disparaging or misrepresenting the company's products or services or its employees" which would reasonably be read to mean that employees could not speak to their coworkers and voice criticism of managers.

---

[16] See, e.g., *Albertson's, Inc.,* 300 NLRRB 1013, fn. 2 (1990), cited in *Guardsmark,* supra, 344 NLRB at 812 (where unlawful rule maintained as a companywide policy, generally employer must post appropriate notice at all facilities where policy has been or is in effect).

[17] If no exceptions are filed as provided by Sec. 102.46 of the Board's Rules and Regulations, the findings, conclusions, and recommended Order shall, as provided in Sec. 102.48 of the Rules, be adopted by the Board and all objections to them shall be deemed waived for all purposes.

(e) In any like or related manner interfering with, coercing, or restraining employees in the exercise of the exercise of the rights guaranteed them by Section 7 of the Act.

2. Take the following affirmative action necessary to effectuate the policies of the Act.

(a) Rescind the 2014 and 2015 Code of Conduct Section 1.6 Solicitation and Fundraising that prohibits employees' use of Respondent's email system to engage in electronic solicitation or electronic distribution.

(b) Rescind its 2014 Code of Conduct Section 1.8 Employee Privacy at the handful of locations where it is still in effect which would be reasonably read to prohibit employee discussion of wages, hours, and terms and conditions of employment.

(c) Rescind the 2014 and 2015 Code of Conduct Section 3.4.1 Prohibited Activities to the extent it contravenes *Purple Communications* and is also overly broad in the use of "embarrassment" as a cause for discipline in use of email, instant messaging, intranet, and internet.

(d) Rescind the 2014 and 2015 Code of Conduct Conclusion rule (1) prohibiting "disclosure of company, customer or employee records, data, funds, property or information (whether or not it is proprietary)," which would reasonably be understood to preclude discussion of wages, hours, and terms and conditions of employment and (2) prohibiting comments which are "disparaging or misrepresenting the company's products or services or its employees" which would reasonably be read to mean that employees could not speak to their coworkers and voice criticism of managers.

(e) Within 14 days after service by the Region, post at all of its facilities nationwide where the unlawful policies have been in effect or are currently in effect the attached notice marked "Appendix."[18] Copies of the notice, on forms provided by the Regional Director for Region 28, after being signed by the Respondent's authorized representative, shall be posted by Respondent and maintained for 60 consecutive days in conspicuous places including where notices to employees are customarily posted. In addition to physical posting of paper notices, notices shall be distributed electronically, such as by email, posting on an intranet or an internet site, and/or other electronic means. Reasonable steps shall be taken by the Respondent to ensure that the notices are not altered, defaced, or covered by any other material. If the Respondent has gone out of business or closed any of its facilities involved in this proceeding, the Respondent shall duplicate and mail, at its own expense, a copy of the notice to all current employees and former employees employed by Respondent at any time since August 2014.

(f) Within 21 days after service by the Region, file with the Region Director for Region 28 a sworn certification of a responsible official on a form provided by the Region attesting to the steps that Respondent has taken to comply.

Dated, Washington, D.C. September 18, 2015

---

[18] If this Order is enforced by a judgment of a United States court of appeals, the words in the notice reading "Posted by Order of the National Labor Relations Board" shall read "Posted Pursuant to a Judgment of the United States Court of Appeals enforcing an Order of the National Labor Relations Board."

APPENDIX

NOTICE TO EMPLOYEES
POSTED BY ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
An Agency of the United States Government

The National Labor Relations Board has found that we violated Federal labor law and has ordered us to post and obey this notice.

FEDERAL LAW GIVES YOU THE RIGHT TO

Form, join, or assist a union

Choose representatives to bargain with us on your behalf

Act together with other employees for your benefit and protection

Choose not to engage in any of these protected activities.

WE WILL NOT maintain the 2014 and 2015 Code of Conduct Section 1.6 Solicitation and Fundraising that prohibits employees' use of Verizon's email system to engage in electronic solicitation or electronic distribution.

At a handful of locations where the 2015 Code of Conduct is not yet in effect, WE WILL NOT maintain the 2014 Code of Conduct Section 1.8 Employee Privacy which would be reasonably read to prohibit employee discussion of wages, hours, and terms and conditions of employment.

WE WILL NOT maintain the 2014 and 2015 Code of Conduct Section 3.4.1 Prohibited Activities which does not allow employees to access the Verizon email system for Section 7-protected communications on nonworking time and is also overly broad in the use of "embarrassment" as a cause for discipline in use of email, instant messaging, intranet, and internet.

WE WILL NOT maintain the 2014 and 2015 Code of Conduct Conclusion rule (1) prohibiting "disclosure of company, customer or employee records, data, funds, property or information (whether or not it is proprietary)," which would reasonably be understood to preclude you from discussing your wages, hours, and terms and conditions of employment and (2) prohibiting comments which are "disparaging or misrepresenting the company's products or services or its employees" which would reasonably be read to mean that you could not speak to your coworkers and voice criticism of managers.

WE WILL NOT in any like or related manner interfere with, restrain, or coerce you in the exercise of rights guaranteed you by Section 7 of the Act.

WE WILL within 14 days rescind the 2014 and 2015 Code of Conduct Section 1.6 Solicitation and Fundraising; where it is still in effect, WE WILL rescind 2014 Code of Conduct Section 1.8 Employee Privacy; WE WILL rescind the 2014 and 2015 Code of Conduct Section 3.4.1 Prohibited Activities; and WE WILL rescind the 2014 and 2015 Code of Conduct Conclusion rule (1) prohibiting "disclosure of company, customer or employee records, data, funds, property or information (whether or not it is proprietary)," and (2) prohibiting comments which are "disparaging or misrepresenting the company's products or services or its employees."

22                       DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

WE WILL notify all employees at all of our facilities within the United States and its territories where the 2014 and 2015 Code of Conduct Section 1.6 Solicitation and Fundraising, were in existence, that such policies have been rescinded and will no longer be enforced.

CELLCO      PARTNERSHIP      D/B/A      VERIZON
WIRELESS

The Administrative Law Judge's decision can be found at www.nlrb.gov/case/28-CA-145221 or by using the QR code below. Alternatively, you can obtain a copy of the decision from the Executive Secretary, National Labor Relations Board, 1099 14th Street, N.W., Washington, D.C. 20570, or by calling (202) 273–1940.

